TIFFANY CHEUNG (BAR NO. 211497)
TCheung@mofo.com
CAMILLE FRAMROZE (BAR NO. 332075)
CFramroze@mofo.com
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone: (415) 268-7000
Facsimile:(415) 268-7522

ELISABETH HUTCHINSON *(admitted pro hac vice)*
EHutchinson@mofo.com
Morrison & Foerster LLP
370 17th Street, Suite 4200
Denver, CO 80202-5638
Telephone: (303) 592-1500
Facsimile: (303) 592-1510

Attorneys for Defendant
EXPRESS SCRIPTS PHARMACY, INC. DBA
WWW.EXPRESS-SCRIPTS.COM

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MIGUEL ESPARZA<br><br>Plaintiff,<br><br>v.<br><br>EXPRESS SCRIPTS PHARMACY, INC., a Delaware entity, dba WWW.EXPRESS-SCRIPTS.COM,<br><br>Defendant. | Case No. 3:25-cv-1988 AJB DDL<br><br>**DECLARATION OF TIFFANY CHEUNG IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS OR STAY THE ACTION UNDER THE FIRST-TO-FILE RULE, OR IN THE ALTERNATIVE TO DISMISS UNDER RULES 12(b)(1) AND 12(b)(6)**<br><br>Date: January 15, 2026<br>Time: 2 p.m.<br>Courtroom: 4A (4th Floor)<br>Judge:  Hon. Anthony J. Battaglia |

1

I, Tiffany Cheung, hereby declare as follows:

1.  I am an attorney admitted to practice in the State of California and before this Court, and I am a partner of the law firm of Morrison & Foerster LLP, counsel of record for Defendant Express Scripts Pharmacy, Inc.  I make this declaration in support of Express Scripts' Motion to Dismiss Plaintiff's Complaint and Express Scripts' Request for Judicial Notice of the exhibits listed below.  I have personal knowledge of the facts set forth below and if called as a witness, could testify competently thereto.

2.  Attached as **Exhibit A** is a true and correct copy of the Third Amended Complaint in *Lynch v. Express Scripts Holding Co.*, No. 3:23-cv-01170-AMO (N.D. Cal.), ECF No. 64, filed on August 26, 2025.

3.  Attached as **Exhibit B** is a true and correct copy of the homepage of www.express-scripts.com, archived by the Internet Archive's Internet Wayback Machine on April 1, 2025, *available at*: http://web.archive.org/web/20250401002252/https://www.express-scripts.com/, last accessed on October 24, 2025;

4.  Attached as **Exhibit C** is a true and correct copy of a screenshot of the cookie consent banner directed at "California residents" and displayed on the www.express-scripts.com webpage, as archived by the Internet Archive's Internet Wayback Machine on April 1, 2025, *available at*: http://web.archive.org/web/20250401002252/https://www.express-scripts.com/, last accessed on October 24, 2025;

5.  Attached as **Exhibit D** is a true and correct copy of Express Scripts' Website and Mobile Application Privacy Notice, last updated November 25, 2024, available at https://www.express-scripts.com/frontend/consumer-legal-ui/#/legal?type=Privacy, last accessed on October 24, 2025.

I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct. Executed on October 24, 2025, in Oakland, California.

_/s/ Tiffany Cheung_
Tiffany Cheung

**TABLE OF CONTENTS**
EXHIBITS TO THE DECLARATION OF TIFFANY CHEUNG IN SUPPORT
OF DEFENDANT'S MOTION TO DISMISS OR STAY THE ACTION UNDER
THE FIRST-TO-FILE RULE, OR IN THE ALTERNATIVE TO DISMISS
UNDER RULES 12(B)(1) AND 12(B)(6)

| EXHIBIT NO. | DESCRIPTION | PAGE NO. |
|---|---|---|
| A | Third Amended Complaint in *Lynch v. Express Scripts Holding Co.*, No. 3:23-cv-01170-AMO (N.D. Cal.), ECF No. 64, filed on August 26, 2025 | 6 |
| B | Homepage of www.express-scripts.com, archived by the Internet Archive's Internet Wayback Machine on April 1, 2025, *available at*: http://web.archive.org/web/20250401002252/https://www.express-scripts.com/ | 36 |
| C | Screenshot of the cookie consent banner directed at "California residents" and displayed on the www.express-scripts.com webpage, as archived by the Internet Archive's Internet Wayback Machine on April 1, 2025, *available at*: http://web.archive.org/web/20250401002252/https://www.express-scripts.com/ | 39 |
| D | Express Scripts' Website and Mobile Application Privacy Notice, last updated November 25, 2024, *available at* https://www.express-scripts.com/frontend/consumer-legal-ui/#/legal?type=Privacy | 40 |

# EXHIBIT A

**BURSOR & FISHER, P.A.**
L. Timothy Fisher (State Bar No. 191626)
Jenna L. Gavenman (State Bar No. 348510)
Joshua B. Glatt (State Bar No. 354064)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
        jgavenman@bursor.com
        jglatt@bursor.com

**SWIGART LAW GROUP, APC**
Joshua B. Swigart (State Bar No. 225557)
2221 Camino del Rio S, Suite 308
San Diego, CA 92108
Telephone: (866) 219-3343
Facsimile: (866) 219-8344
E-mail: Josh@SwigartLawGroup.com

*Attorneys for Plaintiff*

**THE BARRY LAW OFFICE, LTD**
Peter F. Barry (MN #0266577)
*Admitted pro hac vice*
1422 Asbury Street
St. Paul, MN 55108
Telephone: (612) 379-8800
E-mail: pbarry@lawpoint.com

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JONATHAN LYNCH, individually and on behalf of others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br><br>EXPRESS SCRIPTS HOLDING COMPANY,<br><br>Defendant. | CASE NO: 3:23-CV-01170-AMO<br><br>**THIRD AMENDED CLASS ACTION COMPLAINT**<br><br>COMPLAINT FOR DAMAGES FOR VIOLATIONS OF:<br><br>1. THE WIRETAP ACT, 18 U.S.C. § 2510 ET SEQ;<br>2. THE CALIFORNIA INVASION OF PRIVACY ACT, CAL. PEN. CODE § 631;<br>3. VIOLATION OF THE CALIFORNIA CONFIDENTIALITY OF MEDICAL INFORMATION ACT, CAL. CIV. CODE § 56, ET SEQ.<br><br>**JURY TRIAL DEMANDED** |

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:23-CV-01170-AMO

Plaintiff Jonathan Lynch ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Express Scripts Holding Company ("Express Scripts" or "Defendant"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to allegations specifically pertaining to himself, which are based on personal knowledge.

**<u>NATURE OF THE ACTION</u>**

1. This is a putative class action lawsuit on behalf of users of Defendant's services, available on its website, www.express-scripts.com (the "Website") and through the Express Scripts mobile application (collectively, the "Express Scripts Platform"), for damages and injunctive relief against Defendant and its present, former, or future direct and indirect parent companies, subsidiaries, affiliates, agents, related entities for violations of the Federal Wiretap Act, 18 U.S.C. § 2510, *et seq.* (the "Wiretap Act") and the California Invasion of Privacy Act ("CIPA"), Cal. Pen. Code § 631, in relation to the enabling of unauthorized interception, collection, recording, and dissemination of Plaintiff's and Class Members' sensitive communications and data.

2. The Federal Legislature passed the Wiretap Act to protect the privacy of the people of the United States. The Wiretap Act is very clear in its prohibition against intentional unauthorized taping, interception, or disclosure of any wire, oral, or electronic communication. In addition to other relevant sections, the Wire Tap Act states that any person who "intentionally discloses, or endeavors to disclose, to any other person the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication," has violated the act. 18 U.S.C. § 2511(c).

3. The California State Legislature passed CIPA to protect the right of privacy of the people of California. Cal. Penal Code § 631 imposes liability on any person who, "by means of any machine, instrument, or contrivance, or in any other manner," (1) "intentionally taps, or makes any unauthorized connection . . . with any telegraph or telephone wire, line, cable, or instrument," (2) "who willfully and without consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent

---

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:23-CV-01170-AMO

from, or received at any place within [the state of California]," (3) "uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained," or (4) "aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section."

4. This case stems from the unauthorized interception and disclosure of Plaintiff's and Class Members' sensitive electronic communications with Defendant. Defendant incorporated Facebook Pixel spyware technology (the "Facebook Pixel") on the Express Scripts Platform, that in turn allowed Meta Platforms, Inc. (f/k/a Facebook, Inc.) ("Facebook" or "Meta"), one of the largest advertising and social media companies in the country, to read, learn the contents of, make reports on Plaintiff's and Class Members' interactions with Defendant's Platform, and use the information for its own benefit.

5. Plaintiff brings this action for every violation of the Wiretap Act which provides for statutory damages of the greater of $10,000 or $100 per day for each violation of 18 U.S.C. § 2510, *et seq.* under 18 U.S.C. § 2520.

6. Plaintiff also brings this action for every violation of California Penal Code § 631 which provides for statutory damages of $5,000 for each violation, pursuant to California Penal Code § 631(a).

7. As discussed in detail below, Defendant incorporated the Facebook Pixel on its Platform and thus allowed Facebook to contemporaneously intercept and transmit in real time Plaintiff's and the Class Members' electronic computer-to-computer data communications, including how Plaintiff and Class Members interacted with the website, mouse movements and clicks, keystrokes, search items, information inputted into the website, and pages and content viewed while visiting the website. Defendant intentionally allowed Facebook to tap and make unauthorized interceptions of Plaintiff's and Class Members' electronic communications on its Platform. Because of Defendant, Facebook was able to read and understand everything Plaintiff and Class Members did on those pages, *e.g.*, what Plaintiff and Class Members searched for, looked at, the information inputted, and items clicked on.

8.      Defendant enabled these unauthorized interceptions and subsequent usage of information collected without knowledge or prior consent of Plaintiff or Class Members.

9.      The Facebook Pixel present on Defendant's Platform is a sophisticated computer software that allows Facebook to contemporaneously intercept, capture, read, observe, re-route, forward, redirect, and receive Plaintiff's and Class Members' electronic communications in real time.

10.      Jonathan Cherki, the CEO of a major spyware company—while discussing the merger of his company with another provider—publicly exposed why companies like Defendant utilize spyware such as the Facebook Pixel to engage in learning the contents of visits to their websites: "The combination of Clicktale and Contentsquare heralds an unprecedented goldmine of digital data that enables companies to interpret and predict the impact of any digital element – including user experience, content, price, reviews and product – on visitor behavior[.]"[1]  Mr. Cherki added that, "this unique data can be used to activate custom digital experiences in the moment via an ecosystem of over 50 martech partners. With a global community of customer and partners, we are accelerating the interpretation of human behavior online and shaping a future of addictive customer experience."[2]

11.      In sum, Defendant illegally enabled Facebook's tapping of, unauthorized connection to, and interception of Plaintiff's and Class Members' private electronic communications with Defendant's Platform.  Defendant's actions thus caused injuries, including violations of Plaintiff's and Class Members' substantive legal privacy rights under the Wiretap Act and CIPA.

## JURISDICTION AND VENUE

12.      This Court has personal jurisdiction over Defendant because it has sufficient minimum contacts with this District in that it operates and markets its services throughout the country and in this District.

---

[1] https://www.prnewswire.com/news-releases/contentsquare-acquires-clicktale-to-create-the-definitive-global-leader-in-experience-analytics-300878232.html.

[2] *Id.*

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:23-CV-01170-AMO

3

Ex. A
9

13.    Jurisdiction of this Court is proper pursuant to 28 U.S.C. § 1331 because this action arises out of Defendant's violations of the Wiretap Act, 18 U.S.C. §2510 *et seq.*

14.    Jurisdiction is also established under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d)(2), because Plaintiff, a citizen of the State of California, seeks relief on behalf of (1) a national class and (2) a California subclass, which will result in at least one Class Member belonging to a different state than Defendant, a Delaware Corporation with its principal place of business in St. Louis, Missouri.

15.    Plaintiff is requesting statutory damages of the greater of $10,000 or $100 per day for each violation of 18 U.S.C. §2510, *et seq.* and $2,500 per violation of Cal. Penal Code §631, which when aggregated among a proposed class number in the hundreds of thousands, exceeds the $5,000,000 threshold for federal court jurisdiction under CAFA.

16.    Therefore, both diversity jurisdiction and the damages threshold under CAFA are present, and this Court has jurisdiction.

17.    Because Defendant conducts business within the State of California, personal jurisdiction is established.

18.    This Court has supplemental jurisdiction over the remaining state law claims pursuant to 28 U.S.C. §1367 because the state law claims form part of the same case or controversy under Article III of the United States Constitution.

19.    Venue is proper pursuant to 28 U.S.C. § 1391 for the following reasons: (i) the conduct complained of herein occurred within this judicial district; and (ii) Defendant conducted business within this judicial district at all times relevant.

## PARTIES TO THE LITIGATION

20.    **Plaintiff Jonathan Lynch** is a California citizen. Plaintiff used the Express Scripts Platform on multiple occasions between April 2022 and December 2022 to obtain prescriptions to treat low insulin and testosterone levels. Plaintiff accessed Express Scripts' Platform through the website on his computer. During the time Plaintiff used the Express Scripts Platform, he maintained a Facebook account. Plaintiff used the same device to access the Express Scripts Platform that he used to access his Facebook account. To obtain his prescriptions, Plaintiff was

required to enter his name, email address, phone number, address, and payment information. He was also required to input further information, such as his date of birth, gender, insurance information, and a diagnosis history related to the testosterone prescription, as it is a controlled substance. Unbeknownst to Plaintiff, Defendant aided and employed the Facebook Pixel throughout its Platform. The Facebook Pixel tracked Plaintiff's use of Defendant's Platform, and then communicated Plaintiff's confidential information to Facebook without Plaintiff's consent. Plaintiff's use of Defendant's Platform included the time during which the Facebook Pixel was secretly deployed throughout the Express Scripts Platform. Plaintiff did not consent to the sharing and interception of his private, sensitive medical data. Had Plaintiff known Express Scripts aided and employed the Facebook Pixel to monitor and share his personal information and other sensitive information with third parties, namely Facebook, including for advertising and other undisclosed purposes, he would never have used the Platform or shared his information with Express Scripts.

21.     **Defendant Express Scripts Holding Company** ("Defendant") is a Delaware corporation headquartered at One Express Way, St. Louis, MO 63121 and does business throughout the United States, deriving substantial revenue from interstate commerce.

## DEFENDANT'S USE OF FACEBOOK PIXEL

22.     Plaintiff brings this action on behalf of himself and other Americans whose privacy has been violated by Defendant's use of the Facebook's Pixel. As explained herein, Defendant knew (or should have known) that its aiding and employing of the Facebook Pixel on its Platform would result in the wrongful, contemporaneous interception, recording, and re-direction of private communications to Facebook. This unlawful collection of data is done without consent or authorization by users of Defendant's Platform, like Plaintiff, in violation of federal and state laws.

23.     Unbeknownst to Plaintiff, and millions of other persons around the country, when Plaintiff accessed Defendant's Platform, the Facebook Pixel secretly deployed on the Platform sent the fact that he had clicked to sign-in to that website to Facebook.

24.     According to Facebook, the kinds of data that the Facebook Pixel causes to be re-directed from Plaintiff's computing device to Facebook are explained as follows:[3]

---

[3] https://www.facebook.com/off_facebook_activity/.

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:23-CV-01170-AMO

Ex. A
11

5

We receive activity from businesses and organizations who use our business tools so they can better understand how their website, app or ads are performing. We use your activity to show you relevant ads and to suggest things you might be interested in.

Examples of interactions include:

• Opened an app
• Logged into app with Facebook
• Visited a website
• Searched for an item
• Added an item to a wishlist
• Added an item to a cart
• Made a purchase
• Made a donation

Businesses and organizations can also send custom interactions that meet certain needs. For example, they may use a custom interaction to create a unique group of customers in order to show them relevant ads.

**Sensitive information is prohibited**
We prohibit businesses and organizations from sharing sensitive information with us, including health and financial data. If we determine that a business or an organization is violating our terms, we will take action against that business or organization.

25. By aiding and employing the Facebook Pixel on its Platform, Defendant aided Facebook's interception of Plaintiff's information, surreptitiously and without consent, including the fact that Plaintiff was communicating with Defendant via its Platform.

26. That activity information was intercepted and disclosed to Facebook each time Plaintiff accessed the Platform, without his prior knowledge or consent.

27. The Facebook Pixel is a snippet of JavaScript code that loads a library of functions which developers can use to track actions users take on their sites. Facebook catalogues and keeps records of users through identifiers. These identifiers collected information about Plaintiff and his device. The Facebook Pixel identifiers include cookies named c-user, datr, fr, and fbp (*i.e.*, Facebook Pixel); and Browser attribute information sufficient to fingerprint the patient's device. Every time the Facebook Pixel logs an action on a third-party website (like Defendant's), it sends the data back to its parent: Meta. With that information, Meta then attempts to match the action to one of its users with Facebook accounts.

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:23-CV-01170-AMO

Ex. A

12

6

28.     The same disclosures occurred for people around the country when they accessed Defendant's Platform.

29.     Facebook monetizes the information it receives through the Facebook Pixel deployed on Defendant's Platform by using it to generate highly profitable targeted advertising on- and-off Facebook.

30.     The targeted advertising Facebook offers for sale includes the ability to target persons based on specific actions that a person has taken on websites like Defendant's, using information gathered by the Facebook Pixel.  This allows Facebook to create a "dossier" on users to effective targeting advertising.

31.     The Facebook Pixel data unlawfully shared also offers the ability to engage in remarketing based on positive targeting—that is, serving specific ad campaigns to users based on the specific actions those patients took on Defendant's Platform.

32.     Defendant's actions described herein give rise to causes of action for: (1) federal and state electronic communications privacy and wiretap claims; and (2) the California Invasion of Privacy Act, Cal. Penal Code §§ 631 and 632.

## FACTS SPECIFIC TO DEFENDANT

33.     Defendant is a pharmacy benefits manager serving over 100 million Americans.[4]

34.     Defendant is publicly traded on the NASDAQ as Express Scripts Holding Co (ticker symbol ESRX) and had gross revenues of more than $25 billion in 2018.[5]

35.     Defendant handled 25% of all pharmacy benefit management business in the United States in 2021.[6]

---

[4] *See* https://www.express-scripts.com/corporate/about (last accessed February 20, 2023).

[5] *See* https://www.investing.com/equities/express-scripts-inc-income-statement (last accessed February 20, 2023).

[6] *See* https://www.managedhealthcareexecutive.com/view/beyond-the-big-three-pbms (last accessed February 20, 2023).

THIRD AMENDED CLASS ACTION COMPLAINT                                                    7
CASE NO. 3:23-CV-01170-AMO                        Ex. A

36.     Defendant is also an online pharmacy that handles millions of prescriptions each year through the Express Scripts Pharmacy.[7]

37.     Defendant dispensed more than 1.6 billion prescriptions in the United States in 2021.[8]

38.     There are approximately 48,524 Express Scripts locations in the United States as of June 22, 2022, with 4,848 California locations.[9]

39.     On August 6, 2021, The U.S. Department of Defense awarded Defendant an exclusive contract for the administration of the TRICARE Pharmacy Program, Fifth Generation, which will serve 9.6 million active-duty service members, their family members, and retirees through 2029, including all of those in California.[10]

40.     As of September 2021, there were 217,889 active-duty and reserve members of the military in California served by Defendant's pharmacy benefit management service.[11]

<strong><u>HOW FACEBOOK PIXEL WORKS</u></strong>

41.     Facebook operates the world's largest social media company.

42.     Facebook maintains profiles on users that include users' real names, locations, email addresses, friends, likes, and communications that Facebook associates with personal identifiers including IP addresses, cookies, and device identifiers.

43.     Facebook also tracks non-users across the web through its widespread Internet marketing products and source code.

---

[7] *See* https://www.express-scripts.com/frequently-asked-questions/about (last accessed February 20, 2023).

[8] *See* https://www.sec.gov/ix?doc=/Archives/edgar/data/1739940/000173994022000007/ci-20211231.htm (last accessed February 20, 2023).

[9] *See* https://www.scrapehero.com/location-reports/Express%20Scripts-USA/ (last accessed February 20, 2023).

[10] *See* https://www.bloomberg.com/press-releases/2021-08-06/express-scripts-awarded-7-year-tricare-pharmacy-program-contract (last accessed February 20, 2023).

[11] *See* https://www.governing.com/now/2021-military-active-duty-personnel-civilians-by-state (last accessed February 20, 2023).

---

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:23-CV-01170-AMO                                                                 8

44. Facebook's revenue is derived almost entirely from selling targeted advertising space on Facebook.com, and to all Internet users on non-Facebook sites that integrate Facebook marketing source code on their websites.

45. Facebook Business is the division that provides advertising services to developers. Facebook Business and the advertising tools it provides to developers are focused on trade and commerce.

46. The Facebook Pixel, a product for Facebook Business, is a "piece of code" that lets developers "measure, optimize and build audiences for … ad campaigns."[12]

47. The Facebook Pixel is an invisible 1x1 web bug that Facebook makes available to web-developers like Defendant to help track ad-driven activity from Facebook and others on their website.

48. Key features of the Facebook Pixel include its ability to help developers like Defendant to: (a) "Measure cross-device conversions" and "understand how your cross-device ads help influence conversion;" (b) "Optimize delivery to people likely to take action" and "ensure your ads are shown to the people most likely to take action;" and (c) "Create custom audience from website visitors" and create "dynamic ads [to] help you automatically show website visitors the products they viewed on your website – or related ones."[13]

49. Facebook describes the Facebook Pixel as "a snippet of Javascript code" that "relies on Facebook cookies, which enable [Facebook] to match … website visitors to their respective Facebook User accounts."[14]

50. Facebook provides simple instructions for developers like Defendant to set up the Facebook Pixel, creates the Facebook code for each developer who installs it, and recommends that the Facebook Pixel code be placed early in the source code for any given webpage or website to ensure that the user will be tracked.

---

[12] https://www.facebook.com/business/learn/facebook-ads-pixel.

[13] *Id.*

[14] *Id.*

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:23-CV-01170-AMO

9

Ex. A

51. By executing the code immediately, Facebook has designed the Facebook Pixel such that Facebook receives the information about customer actions on Defendant's website properties contemporaneous with their making.

52. As soon as an Express Scripts user takes any action on the Platform—such as clicking a button to register, login, or logout of the customer portal—Facebook's source code commands the customer's computing device to re-direct the content of the customer's communication to Facebook while the exchange of the communication between the customer and Defendant is still occurring.

53. The Facebook Pixel code selected by Defendant and deployed on its Platform begins transmitting customer interactions, actions, inputs, selection, mouse clicks, mouse hovers, mouse movements, and/or keyboard inputs instantly in the first milliseconds that a customer accesses Defendant's Platform.

54. Defendant has engineered and coded its website such that no human being could possibly, find, observe, and select—let alone read—the website's terms of use or privacy policy and either be made aware of or consent to such interception designed by Defendant.

55. From the instant a customer accesses Defendant's Platform, the Facebook Pixel is flooding Facebook with information about that customer's visit, providing Facebook with detailed information about IP addresses, page views, button clicks, and other microdata personally identifiable to the customer.

56. By Defendant's design, Facebook receives the content of a customer's portal sign-in communication immediately after the customer clicks the log-in button and even before Defendant receives it.

57. The content of the user's communications with Defendant are re-directed to Facebook while the communications are still occurring.

58. The cookies that Facebook identifies users with include, but are not necessarily limited to, cookies named: c_user, datr, fr, and _fbp.

59. The c_user cookie is a means of identification for Facebook users that Defendant employs on its website. The c_user cookie value is the Facebook equivalent of a user identification

---

THIRD AMENDED CLASS ACTION COMPLAINT      10
CASE NO. 3:23-CV-01170-AMO

Ex. A

16

number.  Each Facebook user account has one— and only one—unique c_user cookie.  Facebook uses the c_user cookie to record user activities and communications.

60.     A skilled computer user can obtain the c_user cookie value for any Facebook user by (1) going to the user's Facebook page, (2) right-clicking on their mouse, (3) selecting 'View page source,' (4) executing a control-F function for "fb://profile," and (5) copying the number value that appears after "fb://profile" in the page source code of the target Facebook user's page.

61.     It is even easier to find the Facebook account associated with a c_user cookie: one simply needs to log-in to Facebook, and then type www.facebook.com/#, with # representing the c_user cookie identifier.

62.     For example, the c_user cookie value for Mark Zuckerberg is 4.  Logging in to Facebook and typing www.facebook.com/4 in the web browser retrieves Mark Zuckerberg's Facebook page: www.facebook.com/zuck.

63.     The Facebook datr cookie identifies the person's specific web browser from which the person is sending the communication.  It is an identifier that is unique to the person's specific web browser and is therefore a means of identification for Facebook users.

64.     Facebook keeps a record of every datr cookie identifier associated with each of its users, and a Facebook user can obtain a redacted list of all datr cookies associated with his or her Facebook account from Facebook.

65.     Any Facebook user can view the specific datr cookie identifiers that Facebook has associated with their account by using the Facebook Download Your Information tool.

66.     Facebook expressly admits that the Facebook Pixel "log[s] when someone takes an action" such as "adding an item to their shopping cart or making a purchase."

67.     The Facebook fr cookie is an encrypted combination of the c_user and datr cookies.[15]

---

[15] *See* Facebook Tracking Through Social Plug-ins: Technical Report prepared for the Belgian Privacy Commission, Mar. 27, 2015, available at https://securehomes.esat.kuleuven.be/~gacar/fb_tracking/fb_pluginsv1.0.pdf.

THIRD AMENDED CLASS ACTION COMPLAINT                                                          11
CASE NO. 3:23-CV-01170-AMO                    Ex. A

68.     The Facebook _fbp cookie is a Facebook identifier that is set by Facebook source code and associated with Defendant's use of the Facebook Pixel. The _fbp cookie is a Facebook cookie that masquerades as a first-party cookie to evade third party cookie blockers and share data more directly between a website that has deployed Facebook Pixel and Facebook.[16]

69.     To deploy the Facebook Pixel software, website developers like Defendant simply copy-paste the Facebook Pixel code that Facebook creates to their web page.

70.     Through the Facebook Pixel embedded in Defendant's website, Facebook was able to and did access sensitive personal and health information provided by Plaintiff and Class Members to Express Scripts, and incorporated that accessed information into its profiles of Plaintiff and Class Members.

### FACTS SPECIFIC TO PLAINTIFF AND CLASS MEMBERS

71.     On multiple occasions between April 2022 and December 2022, Plaintiff accessed Defendant's Platform.

72.     Plaintiff was in California during Plaintiff's visits to Defendant's Platform.

73.     Plaintiff accessed Defendant's Platform via a personal computer using hardwired internet access.

74.     Unbeknownst to Plaintiff, Defendant deployed—and so aided—the Facebook Pixel software on its Platform to collect and transmit in real time to a third party, Facebook, the contents of communications while the same are in transit.

75.     Defendant installed and configured the Facebook Pixel on its Platform in a manner that permitted Facebook to contemporaneously intercept and transmit Plaintiff's private communications in real time. Specifically, Defendant's deployment of the Facebook Pixel caused Plaintiff's interactions with the Platform—including actions such as clicking buttons, navigating pages, and entering sensitive information including search terms—to be automatically and invisibly redirected to Facebook's servers as those interactions occurred, without Plaintiff's knowledge or consent. Defendant exercised full control over the configuration and deployment of the Facebook

---

[16] https://developers.facebook.com/docs/marketing-api/conversions-api/parameters/fbp-and-fbc/.

THIRD AMENDED CLASS ACTION COMPLAINT                                           12
CASE NO. 3:23-CV-01170-AMO
Ex. A
18

Pixel and selected settings that caused the Facebook Pixel to intercept and transmit confidential user communications to Facebook contemporaneously and without user authorization.

76. These private communications included items such as page views, button clicks, names of buttons clicked, microdata, mouse clicks, mouse hovers, scrolling, and other observable website interactions, selections, and communications.

77. During visits to the Platform, Plaintiff and Class Members, through computers and/or mobile devices, transmitted electronic communications to Defendant. The communications were recorded by the Facebook Pixel and sent to Facebook as messages indicating what content was being viewed, clicked on, requested and/or inputted by Plaintiff and Class Members. These communications included, but were not limited to, the following actions taken by Plaintiff and Class Members while using Defendant's Platform: mouse clicks and movements, keystrokes, search items, information inputted, pages and content viewed, scroll movements, and copy and paste actions.

78. Plaintiff and Class Members reasonably expected that visits to Defendant's Platform would be private, and that Defendant would not be enabling the interception or tapping of their communications with Defendant's Platform, particularly because Defendant failed to present Plaintiff and Class Members with a pop-up disclosure or consent form alerting Plaintiff that the visits to the Platform were monitored, recorded, and shared via the Facebook Pixel.

79. Plaintiff and Class Members reasonably believed their interactions with Defendant's Platform were private and would not be monitored live while Plaintiff and Class Members were using the Platform.

80. On information and belief, during all times relevant to this action, Defendant has had the Facebook Pixel embedded within its Platform code.

81. The Facebook Pixel is not a provider of wire or electronic communication services, or an internet service provider.

82. The Facebook Pixel was not instrumental or necessary to the operation or function of Defendant's Platform or business.

83. Defendant caused the interception by Facebook of Plaintiff's electronic communications by enabling the Facebook Pixel to contemporaneously intercept and transmit

Plaintiff's interactions on the Platform to Facebook. This software integration was neither instrumental nor necessary to Defendant's provision of any goods or services. Rather, the level and detail of information surreptitiously collected by the Facebook Pixel and shared to Facebook indicates that the only purpose was to gain an unlawful understanding of the habits and preferences of users of Defendant's Platform. The information collected was solely for Defendant's and Facebook's own marketing and advertising benefits.

84. During Plaintiff's and Class Members' visits to Defendant's Platform, Defendant intentionally deployed and configured the Facebook Pixel on its Platform in a manner that enabled Facebook to intercept the substance of Plaintiff's electronic communications as those communications occurred. As a direct result of Defendant's implementation, Facebook captured in real time Plaintiff's mouse clicks, keystrokes, search terms, content viewed, and other interactions with the Platform including confidential and personally identifiable information, such as prescription-related activity, personal inputs, and interaction metadata.

85. The relevant facts regarding the full parameters of the communications intercepted and transmitted by the Facebook Pixel and the extent of how the connections occurred are solely within the possession and control of Defendant and Facebook.

86. The Facebook Pixel aided and employed by Defendant on its website is not a website cookie, standard analytics tool, web beacon, or other similar technology.

87. Unlike harmless collection of an internet protocol address, the data intercepted and collected by the Facebook Pixel concerned specific content information inputted and content viewed, and transmitted the same to Facebook in real time for its aggregation, use, and sale to drive advertising. Information shared revealed personalized and sensitive information about Plaintiff's and Class Member's internet activity and habits.

88. The electronic communications intentionally intercepted by the Facebook Pixel and transmitted to Facebook were content generated through Plaintiff's use, interaction, and communication with Defendant's Platform relating to the substance, purport, and/or meaning of Plaintiff's and Class Members' communications with the Platform.

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:23-CV-01170-AMO

Ex. A

20

14

89. The electronic communications intercepted and transmitted by the Facebook Pixel were not generated automatically and were not incidental to other consumer communications.

90. The Facebook Pixel—which Defendant installed and employed on its website—allows Facebook to intercept, tap, make unauthorized connections and transmit communications in real time, which allowed Facebook to learn the contents of communications of Plaintiff and Class Members in a manner that was undetectable to them.

91. Defendant—by employing the Facebook Tracking Pixel on its website—aided it to, in real time, read, learn, and/or attempt to learn, the contents of the transmissions of the communications to Facebook for its business purposes.

92. Defendant never sought consent and Plaintiff and Class Members never provided consent for Facebook's unauthorized access to their electronic communications. Plaintiff and Class Members thus did not have a reasonable opportunity to discover Defendant's unlawful and unauthorized enabling of Facebook's activity.

## FACEBOOK PIXEL EAVESDROPPING ON DEFENDANT'S PLATFORM

93. Using third party publicly available software, Plaintiff has been able to analyze the web traffic between a computer and a website with which it is interacting.

94. This third-party software monitors and records all inbound and outbound data requests made by a website in a user's browser.

95. Testing was done between a standard Google Chrome Browser and Defendant's Platform with this third-party software running in the background.

96. During these tests, this third-party software reported that Defendant's Platform affirmatively interacted in the background with Facebook servers at least 16 times, 3 of which were connections to Facebook servers and 13 were "GET" requests from Facebook servers.

97. On information and belief, Defendant's Platform repeatedly and continuously communicates private data to Facebook about Plaintiff and Class Members during, at the very least, its signup process, including the name of the person signing up, date of birth, zip code, button text clicked, IP address, exact URL referred, and other personally identifiable information.

THIRD AMENDED CLASS ACTION COMPLAINT                                                          15
CASE NO. 3:23-CV-01170-AMO                    Ex. A
21

98. The interception and transmission to Facebook by the Facebook Pixel employed on Defendant's Platform occurs simultaneously without the user's knowledge or awareness.

99. Defendant's aiding and employing of Facebook's eavesdropping on Plaintiff's and Class Members' private communications with Defendant happens well before the user of the website is ever presented any clickable links to a privacy policy or terms of service.

**COMMUNICATIONS WITH EXPRESS SCRIPTS ARE CONFIDENTIAL BY NATURE**

100. Patient health care information in the United States is protected by federal law under the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and its implementing regulations promulgated by the United States Department of Health and Human Services ("HHS").

101. The HIPAA Privacy Rule establishes:

> [N]ational standards to protect individuals' medical records and other individually identifiable health information (collectively defined as "protected health information") and applies to health plans, health care clearinghouses, and those health care providers that conduct certain health care transactions electronically. The Rule requires appropriate safeguards to protect the privacy of protected health information and sets limits and conditions on the uses and disclosures that may be made of such information without an individual's authorization. The Rule also gives individuals rights over their protected health information, including rights to examine and obtain a copy of their health records, to direct a covered entity to transmit to a third party an electronic copy of their protected health information in an electronic health record, and to request corrections. The Privacy Rule is located at 45 CFR Part 160 and Subparts A and E of Part 164.

https://www.hhs.gov/hipaa/for-professionals/privacy/index.html.

102. Under 45 C.F.R. § 164.502, a health care provider or business associate of a health care provider "may not use or disclose 'protected health information' except as permitted or required by" the HIPAA Privacy Rule.

103. Under 45 C.F.R. 160.103, the Privacy Rule defines "protected health information" or PHI as "individually identifiable health information" that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium."

104. Under 45 C.F.R. § 160.103, the Privacy Rule defines "individually identifiable health information" as "a subset of health information, including demographic information

THIRD AMENDED CLASS ACTION COMPLAINT 16
CASE NO. 3:23-CV-01170-AMO

Ex. A
22

collected from an individual" that is (1) "created or received by a health care provider;" (2) "[r]elates to the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or the past, present, or future payment for the provision of health care to an individual;" and (3) either (a) identifies the individual; or (b) with respect to which there is a reasonable basis to believe the information can be used to identify the individual."

105. HHS has previously instructed that HIPAA covers patient-status alone:

"The sale of a patient list to a marketing firm" is not permitted under HIPAA. 65 Fed. Reg. 82717 (Dec. 28, 2000);

"A covered entity must have the individual's prior written authorization to use or disclose protected health information for marketing communications," which would include disclosure of mere patient status through a patient list. 67 Fed. Reg. 53186 (Aug. 14, 2002);

It would be a HIPAA violation "if a covered entity impermissibly disclosed a list of patient names, addresses, and hospital identification numbers." 78 Fed. Reg. 5642 (Jan. 25, 2013); and

The only exception permitting a hospital to identify patient status without express written authorization is to "maintain a directory of individuals in its facility" that includes name, location, general condition, and religious affiliation when used or disclosed to "members of the clergy" or "other persons who ask for the individual by name." 45 C.F.R. § 164.510(1). Even then, patients must be provided an opportunity to object to the disclosure of the fact that they are a patient. 45 C.F.R. § 164.510(2).

106. There is no HIPAA-exception for the Internet or online patient portals.

107. Defendant, as a pharmacy benefits manager and online pharmacy, collects information from users that qualifies as individually identifiable health information. The nature of information shared by Express Scripts users is exclusively related to patient status and health information.

108. Defendant did not procure HIPAA authorizations from the Plaintiff or other members of the class for the disclosure of patient status and health information to Facebook.

109. On webpages that employ the Facebook Pixel, the source code causes the exact content of the patient's communication with their health care provider to be intercepted by

Facebook and re-directed instantly and in real time to Facebook in a fashion that identifies them as a patient.

110. Facebook consistently creates marketing campaigns with information obtained from medical portals that disclose patient identities and their individually identifiable health information to Facebook, for the purpose of targeted marketing based on patient communications with their medical portals.

## CLASS ACTION ALLEGATIONS

111. Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23 individually and on behalf of the following Class:

> **Nationwide Class**
> All natural persons in the United States who used the Express Scripts Platform and whose communications and/or data were shared with third parties, including Facebook.
>
> In addition, or in the alternative, Plaintiff pleads the following State Subclass:
>
> **California Subclass**
> All natural persons in the State of California who used the Express Scripts platform and whose communications and/or data were shared with third parties, including Facebook.

112. Excluded from each Class are: (1) Defendant, any entity or division in which Defendant has a controlling interest, and its legal representatives, officers, directors, assigns, and successors; (2) the Judge to whom this case is assigned and the Judge's staff; and (3) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiff reserves the right to redefine each Class and to add subclasses as appropriate based on discovery and specific theories of liability.

113. **Numerosity**: The exact number of Class Members is currently unknown and unavailable to Plaintiff at this time, but individual joinder in this case is impracticable. The Class likely consists of millions of individuals, and Members can be identified through Express Scripts' records.

---

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:23-CV-01170-AMO                    18

Ex. A
24

114. **Commonality**: There are common questions of law and fact as to Class Members that predominate over questions affecting only individual members, including, but not limited to:

    a.    Whether Defendant violated Plaintiff's and Class Members' privacy rights;

    b.    Whether Defendant's acts and practices violated the Common Law Invasion of Privacy;

    c.    Whether Defendant was unjustly enriched;

    d.    Whether Defendant's acts and practices violated California's Confidentiality of Medical Information Act, Civil Code §§ 56, *et seq.*;

    e.    Whether Defendant's acts and practices violated the California Invasion of Privacy Act, Cal. Penal Code §§ 630, *et seq.*;

    f.    Whether Plaintiff and Class Members are entitled to equitable relief, including but not limited to, injunctive relief, restitution, and disgorgement; and

    g.    Whether Plaintiff and Class Members are entitled to actual, statutory, punitive or other forms of damages, and other monetary relief.

115. **Typicality**: Plaintiff's claims are typical of the claims of the other members of the Class. The claims of Plaintiff and Class Members arise from the same conduct by Defendant and are based on the same legal theories.

116. **Adequacy**: Plaintiff has and will continue to fairly and adequately represent and protect the interests of the Class. Plaintiff has retained counsel competent and experienced in complex litigation and class actions, including litigations to remedy privacy violations. Plaintiff has no interests that are antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiff. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the Class Members, and they have the resources to do so. Neither Plaintiff nor his counsel have any interest adverse to the interests of other Class Members.

117. **Predominance**: Questions of law or fact common to the Class Members predominate over any questions affecting only individual members of each Class. The elements of the legal claims brought by Plaintiff and Class Members are capable of proof at trial through evidence that is common to each Class rather than individual to its members.

118. **Superiority**: A class action is a superior method for the fair and efficient adjudication of this controversy because:

    a.    Class-wide damages are essential to induce Defendant to comply with Federal

and California law.

b. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendant's misconduct.

c. Management of these claims is likely to present significantly fewer difficulties than those presented in many class claims.

d. Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy at law.

e. Class action treatment is manageable because it will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would endanger.

f. Absent a class action, Class Members will continue to incur damages, and Defendant's misconduct will continue without remedy.

119. Plaintiff and the Class Members have suffered, and will continue to suffer, harm and damages as a result of Defendant's unlawful and wrongful conduct. A class action is superior to other available methods because as individual Class Members have no way of discovering that Defendant affirmatively enabled Facebook to intercept and record Plaintiff's and Class Members' electronic communications in real time by integrating and configuring the Facebook Pixel into its Platform. Through this implementation, Facebook—not Defendant—carried out the actual interception by capturing and transmitting users' communications as they occurred, all without Plaintiff's knowledge or consent.

120. Each Class may also be certified because:

a. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudication with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant;

b. The prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to them that would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

c. Defendant has acted, or refused to act, on grounds generally applicable to each Class, thereby making appropriate final and injunctive relief with respect to the members of each Class as a whole.

THIRD AMENDED CLASS ACTION COMPLAINT                                   20
CASE NO. 3:23-CV-01170-AMO

121. The joinder of Class Members is impractical and the disposition of their claims in the Class action will provide substantial benefits both to the parties and to the court. The Class Members can be identified through Defendant's records.

## TOLLING

122. Any applicable statute of limitations has been tolled by Defendant's knowing and active concealment of the misrepresentations and omissions alleged herein. Through no fault or lack of diligence, Plaintiff and Class Members were deceived and could not reasonably discover Defendant's deception and unlawful conduct.

123. Plaintiff and Class Members did not discover and did not know of any facts that would have caused a reasonable person to suspect that Defendant was acting unlawfully and in the manner alleged herein. As alleged herein, the representations made by Defendant were material to Plaintiff and Class Members at all relevant times. Within the time period of any applicable statutes of limitations, Plaintiff and Class Members could not have discovered through the exercise of reasonable diligence the alleged wrongful conduct.

124. Defendant knowingly, actively, affirmatively and/or negligently concealed the facts alleged herein. Plaintiff and Class Members reasonably relied on Defendant's concealment.

125. For these reasons, all applicable statutes of limitation have been tolled based on the discovery rule and Defendant's concealment, and Defendant is estopped from relying on any statutes of limitations in defense of this action.

## CAUSES OF ACTION

### COUNT I
**Violation Of The Wiretap Act**
**18 U.S.C. § 2510 *et seq.***

126. Plaintiff repeats, re-alleges, and incorporates by reference, all other paragraphs of this complaint.

127. The Wiretap Act, as amended by the Electronic Communications and Privacy Act of 1986, prohibits the intentional interception of any wire, oral, or electronic communication.

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:23-CV-01170-AMO

Ex. A

27

21

128. Under 18 U.S.C. § 2520(a) there is a private right of action to any person whose wire, oral, or electronic communication is intercepted.

129. Defendant intentionally configured its Platform to facilitate Facebook's real-time interception of Plaintiff's and Class Members' electronic communications. Defendant's implementation of the Facebook Pixel caused Facebook to contemporaneously capture and redirect those intercepted communications from users to Facebook, as they occurred on the Platform.

130. Plaintiff and Class Members were unaware Defendant was enabling Facebook to intercept and transmit their electronic communications in real time through the Facebook Pixel and tracking their communications and interactions with Defendant's Platform.

131. Defendant intentionally employed technology—the Facebook Pixel—that enabled Facebook to intercept, transmit in real time, and acquire the contents of Plaintiff's and Class Members' electronic communications, in violation of 18 U.S.C. § 2511.

132. Plaintiff and Class Members are persons whose electronic communications were intercepted by Facebook, as a consequence of Defendant's enabling. As such, they are entitled to preliminary, equitable, and declaratory relief, in addition to statutory damages of the greater of $10,000 or $100 per day for each violation, actual damages, punitive damages, and reasonable attorneys' fees and costs under 18 U.S.C. § 2520.

### COUNT II
**Unlawful Wiretapping and Interception of Electronic Communication**
**California Penal Code § 631**
**(On Behalf of Plaintiff and the California Subclass)**

133. Plaintiff pleads this claim in the alternative individually and on behalf of the California Subclass.

134. Plaintiff repeats, re-alleges, and incorporates by reference, all other paragraphs of this complaint.

135. Defendant aided or employed the interception of components of Plaintiff's and Class Members' private electronic communications and transmissions by a third party—specifically, Facebook—when Plaintiff and other Class Members accessed Defendant's Platform from within the State of California. Defendant knowingly configured and deployed the Facebook Pixel in a manner

---

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:23-CV-01170-AMO

Ex. A
28

22

that affirmatively enabled Facebook to act as the direct interceptor of those communications in real time. Facebook intercepted, captured, read, and used the contents of these communications, which included confidential, personally identifiable, and medical-related data provided by Plaintiff and Class Members during their interactions with Defendant's Platform, as they occurred, and Defendant's conduct constituted knowing facilitation and substantial assistance in that unlawful interception. These interceptions occurred while the communications were still in transit between Plaintiff and Defendant's Platform, as Facebook received the data before it was fully delivered to or processed by Defendant.

136. Plaintiff and Class Members were completely unaware that Defendant had aided or employed the Facebook Pixel to intercept and transmit electronic communications and other personal data to Facebook until well after it had already occurred and were therefore unable to consent.

137. Defendant never advised Plaintiff or the other Class Members that any part of their communications or use of Defendant's Platform would be tapped and thereafter delivered to the third-party, Facebook.

138. To establish liability under section 631(a), a plaintiff need only establish that the defendant, "by means of any machine, instrument, contrivance, or in any other manner" does any of the following:

> Intentionally taps, or makes any unauthorized connection, whether physically, electrically, acoustically, inductively or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system,
>
> ***Or***
>
> Willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads or attempts to read or learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line or cable or is being sent from or received at any place within this state,
>
> ***Or***

Uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained,

***Or***

Aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

139.    Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *Matera v. Google Inc*., 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc*., 2006 WL 3798134, at *5-6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litigation*, 956 F. 3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' Internet browsing history).

140.    The California Supreme Court has held that "Section 631 was aimed at one aspect of the privacy problem—eavesdropping, or the secret monitoring of conversations by third parties." *Ribas v. Clark*, 38 Cal. 3d 355, 359 (1985) (citation omitted).

141.    "California courts interpret 'eavesdrop,' . . . to refer to a third party secretly listening to a conversation between two other parties." *Thomasson v. GC Servs. Ltd. P'ship*, 321 F. App'x 557, 559 (9th Cir. 2008).

142.    Defendant's employment of the Facebook Pixel on its Platform is a "machine, instrument, contrivance, or . . . other manner" used to engage in the prohibited conduct at issue here, namely, enabling the secret interception of private communications by Facebook, the eavesdropping third-party.

143.    As a third-party software vendor, Facebook was not merely recording these secret communications between Plaintiff and the Class Members and Defendant for Defendant's later review and use.

144. Rather, Facebook was enabled in its eavesdropping by Defendant's knowing use of the Facebook Pixel which was harvesting private communications and data for Facebook's own profit.

145. By employing the Facebook Pixel, Defendant enabled a third-party, Facebook, to willfully and without consent, intercept, read or attempt to read or learn the contents or meaning of electronic communications of Plaintiff and putative Class Members, while the electronic communications were in transit or passing over a wire, line or cable or were being sent from or received at a place in California.

146. Plaintiff and Class Members did not consent to any of Defendant's actions in enabling these unauthorized eavesdropping connections by Facebook, nor have Plaintiff or Class Members consented to Defendant's enabling of Facebook's intentional access, interception, reading, learning, recording, eavesdropping, and collection of Plaintiff's and Class Members' electronic communications.

147. Plaintiff's and the Class Members' devices to which Defendant enabled access to by a third-party through its unauthorized actions included their computers, smart phones, and tablets and/or other electronic computing devices.

148. Defendant violated Cal. Penal Code § 631 by enabling a third-party, Facebook, in knowingly eavesdropping on and accessing, without permission, Plaintiff's and Class Members' electronic communications through the use of the Facebook Pixel in order for Facebook to track, understand, and attempt to learn the contents of Plaintiff's and Class Members' electronic communications generated by the use of Defendant's Platform.

149. Defendant violated Cal. Penal Code § 631 by knowingly and without permission enabling the interception, eavesdropping, wiretapping, accessing, taking, and using Plaintiff's and the Class Members' communications by the third-party Facebook.

150. Plaintiff and Class Members seek relief available under Cal. Penal Code § 631, including $2,500 per violation against Defendant for such enabling of eavesdropping by a third-party, Facebook.

**COUNT III**
**Violation of the California Confidentiality of Medical Information Act**
**Cal. Civ. Code § 56, *et seq.***
**(On Behalf of Plaintiff and the California Subclass)**

151. Plaintiff pleads this claim in the alternative individually and on behalf of the California Subclass.

152. Plaintiff repeats, re-alleges, and incorporates by reference, all other paragraphs of this complaint.

153. Defendant is a provider of healthcare within the meaning of Civil Code § 56.06(a) and maintains medical information as defined by Civil Code § 56.05, because the Express Scripts Platform maintains medical information and offers software to consumers that is designed to maintain medical information for the purposes of allowing its users to manage their information or make the information available to a health care provider, or for the diagnosis, treatment, or management of a medical condition.

154. Express Scripts is therefore subject to the requirements of the CMIA and obligated under Section 56.06 subdivision (e) to maintain the same standards of confidentiality required of a provider of health care with respect to medical information that it maintains on behalf of users.

155. The CMIA defines medical information to mean any "individually identifiable information" in possession of or derived from "a provider of health care, health care service plan, pharmaceutical company, or contractor regarding a patient's medical history, mental or physical condition, or treatment." As explained above, the information Express Scripts maintained and disclosed is medical information because it is identifiable information relating to patient's medical histories, conditions, treatments, and prescriptions.

156. Express Scripts violated Cal. Civ. Code Section 56.06(e) because it did not maintain the confidentiality of users' medical information. Express Scripts disclosed to third parties Plaintiff's and Class Members' medical information without consent, including information concerning medications they were taking or were prescribed.

157. Plaintiff and the members of the California Subclass are patients of Defendant, as defined in Civil Code § 56.05(k).

158.    Cal. Civ. Code § 56.10 (a) prohibits a health care provider from disclosing medical information without first obtaining an authorization, unless a statutory exception applies.

159.    Express Scripts disclosed medical information without first obtaining authorization when it disclosed to third party Facebook Plaintiff's and Class Members' data, including PII and prescription requests.  No statutory exception applies.

160.    Express Scripts knowingly and willfully disclosed medical information without consent to Facebook for financial gain.  Namely, to market and advertise its services, or to allow others to market and advertise its services, in violation of Cal. Civ. Code Section 56.10, subdivision (a).

161.    Express Scripts shared this identifiable information with third party, Facebook, whose primary business includes selling advertisements, analytics, or other insights based on the data it obtains about individuals, and using such data to improve its products, services, and algorithms.

162.    Express Scripts knowingly and willfully disclosed medical information without consent to Facebook for financial gain.  Namely, to sell more products, advertise, obtain analytics, and improve the Express Scripts Platform, in violation of Cal. Civ. Code Section 56.06(e). Defendant's conduct was knowing and willful as it was aware that Facebook would obtain all user data input while using its Platform, yet intentionally embedded Facebook's code anyway.

163.    At the very least, Express Scripts negligently disclosed medical information in violation of Cal. Civ. Code Section 56.10, subdivision (a) through the unauthorized disclosure of Plaintiff's and Class Members' sensitive medical information.

164.    Because Civil Code § 56.101 allows for the remedies and penalties provided under Civil Code § 56.36(b), Plaintiff, individually and for each member of the California Subclass, seeks nominal damages of one thousand dollars ($1,000) for each violation under Civil Code §56.36(b)(1), and actual damages suffered, if any, pursuant to Civil Code § 56.36(b)(2) and damages provided by the common law.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and Class Members pray that judgment be entered against Defendant, and Plaintiff and Class Members be awarded relief from Defendant, as follows:

---

a.    Certify the Class and appointing Plaintiff as the Class's representative;

b.    Finding Defendant's conduct was unlawful, as alleged herein;

c.    Awarding declaratory relief against Defendant;

d.    Awarding such injunctive relief and other equitable relief as the Court deems just and proper;

e.    Awarding Plaintiff and Class Members statutory, actual, compensatory, consequential, punitive, and nominal damages, as well as restitution and/or disgorgement of profits unlawfully obtained;

f.    Awarding Plaintiff and Class Members pre-judgment and post-judgment interest;

g.    Awarding Plaintiff and Class Members reasonable attorneys' fees, costs, and expenses; and

h.    Any other relief the Court may deem just and proper.

## TRIAL BY JURY

Pursuant to the Seventh Amendment to the Constitution of the United States of America, Plaintiff and Class Members are entitled to, and demand, a trial by jury.

Dated:  August 26, 2025

**BURSOR & FISHER, P.A**.

By:  _/s/ L. Timothy Fisher_

L. Timothy Fisher (State Bar No. 191626)
Jenna L. Gavenman (State Bar No. 348510)
Joshua B. Glatt (State Bar No. 354064)
1990 North California Blvd., 9th Floor
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
E-mail: ltfisher@bursor.com
        jgavenman@bursor.com
        jglatt@bursor.com

**SWIGART LAW GROUP, APC**
Joshua B. Swigart (State Bar No. 225557)
2221 Camino del Rio S, Suite 308
San Diego, CA 92108

---

THIRD AMENDED CLASS ACTION COMPLAINT
CASE NO. 3:23-CV-01170-AMO                                          28

Ex. A
34

Telephone: (866) 219-3343
Facsimile: (866) 219-8344
E-mail: Josh@SwigartLawGroup.com

**THE BARRY LAW OFFICE, LTD**
Peter F. Barry (MN #0266577)
*Admitted pro hac vice*
1422 Asbury Street
St. Paul, MN 55108
Telephone: (612) 379-8800
E-mail: pbarry@lawpoint.com

*Attorneys for Plaintiff*

# EXHIBIT B



Home　　Pharmacy ⌄　　Benefits　　Help ⌄　　Blog　　Search　　English ⌄　　　　Log in ⌄　　Register

# Express Scripts
## By EVERNORTH

# Health care built around you

I'm interested in...

How to use home delivery ⌄

Go



## Save Time and Money with Home Delivery

Skip the trip to the pharmacy. We'll send medication right to your door when you need it.

Skip the pharmacy trip →



## COVID-19 Tests and Resources

Find information about ordering at-home tests, getting vaccinated, and other common COVID-19 questions.

Learn about COVID-19 resources →



## Express Scripts® Mobile App

Manage your medication. Anytime. Anywhere.

Learn more about the mobile app →


Feedback



### Express Scripts by Evernorth

Log in or register to get started. Once we have your prescription, we'll take care of the rest.



### Express Scripts Pharmacy by Evernorth

Get real-time updates as we fill and ship your order, online or with the mobile app.



### $0 Copay Prescriptions

Have questions? Our pharmacists are available 24/7 from the privacy of your home.

Document title: Express Scripts Members: Manage Your Prescriptions Online
Capture URL: http://web.archive.org/web/20250401002252/https://www.express-scripts.com/
Capture timestamp (UTC): Fri, 24 Oct 2025 19:08:34 GMT

Page 1 of 3

https://www.express-scripts.com/    Go    FEB **APR** MAY
INTERNET ARCHIVE
WayBackMachine    **4,022 captures**
4 Nov 1996 - 11 Oct 2025    ◄ **01** ►
2024 **2025** 2026 ▼ About this capture


Log in or register to get started. Once we have your prescription, we'll take care of the rest.

Discover benefits that benefit you →

Get real-time updates as we fill and ship your order, online or with the mobile app.

Explore our pharmacy →

Have questions? Our pharmacists are available 24/7 from the privacy of your home.

Learn more about $0 copays →



# Find answers when you need them.

Have a question about your pharmacy benefits, refilling a prescription, paying a bill, or using your online account? With our Frequently Asked Questions, you can quickly find answers for some of the most common questions.

Explore our FAQs

Feedback

## Get more from Express Scripts

Already have an account? Log In

Register Now





urac
ACCREDITED
Pharmacy Benefit Management
11/01/2025



NABP
Accredited
Digital Pharmacy



NCQA
UTILIZATION
MANAGEMENT

Document title: Express Scripts Members: Manage Your Prescriptions Online
Capture URL: http://web.archive.org/web/20250401002252/https://www.express-scripts.com/
Capture timestamp (UTC): Fri, 24 Oct 2025 19:08:34 GMT    Page 2 of 3



Register Now













| About Us | Help | Resources | Healthcare Professionals |
|---|---|---|---|
| Careers | FAQ | Drug Recalls | Submit a Prior Authorization |
| About Evernorth | Contact us | Disposal of Medications | Physicians |
| Accessibility | Important notices | Forms | Pharmacists |
| Our Partners | | | TRICARE Providers |

Sites & Partners

Inside Rx*

Your prescription may be processed by any pharmacy within our family of Express Scripts mail-order pharmacies.

Express-Scripts uses data from Medi-Span to determine the average wholesale price of prescription drugs not included on the maximum allowable cost list.

© 2025 Express Scripts. All Rights Reserved. 1 Express Way, St. Louis, MO 63121

Non-discrimination Notice / Languages    Notice of Privacy Practices    WA Consumer Health Data Privacy Notice    Privacy    Terms of Use    Site map

Cookie Settings

# EXHIBIT C



http://web.archive.org/web/20250401002252/https://www.express-scripts.com/

# EXHIBIT D



Español

# Express Scripts Website and Mobile Application Privacy Notice

Last Updated: 11/25/2024
Version: 6.0

 **Introduction**

This Privacy Notice ("**Notice**") applies to Personal Information collected through the Express Scripts ("**Express Scripts**", "**we**", "**us**", or "**our**") or affiliated website or mobile application on which it is posted, unless otherwise modified by another notice. We refer to these websites and applications as "**Services**" throughout this Notice. Please note that this Privacy Notice may supplement, or be superseded by, other applicable policies, practices, and notices that may relate to the specific relationship you have with us.

By using our Services and/or providing us your Personal Information, you acknowledge and agree to the terms of this Notice and those within our **Terms of Use** and any supplemental terms specific to the Services you are accessing.

This Notice does not apply to job applicants and candidates who apply for employment with us or to employees in the context of our working relationship with them.

**Health Information**

In some circumstances, our collection and use of Personal Information will be subject to the requirements of the Health Insurance Portability and Accountability Act ("HIPAA"). Identifiable patient or member information related to care or payment for care will be treated as protected health information ("PHI") under HIPAA, at which point the terms of the applicable HIPAA Notice of Privacy Practices will apply and will supersede this notice. Patients of the Express Scripts® Pharmacy should visit the **Express Scripts Notice of Privacy Practices** for additional information. Pharmacy Benefit Management customers should ask their health plan for a copy of its Notice of Privacy Practices.

## Table of Contents

Ex. D

40

 Our Information Practices

1. Personal Information We Collect
2. How We Use Personal Information
3. How We Disclose Personal Information

 Cookies and Other Tracking Technologies

1. Cookies and Other Technologies
2. Tracking and Advertising Choices

 Communication Functionality and Preferences

 State-Specific Disclosures

1. Rights for Residents of Colorado, Connecticut, Delaware, Iowa, Maryland, Minnesota, Montana, Nebraska, New Hampshire, New Jersey, Oregon, Texas, Tennessee, Utah, and Virginia
2. California Privacy Rights

 Additional Information

1. Changes to this Privacy Notice
2. Links to Other Websites
3. Our Online Privacy Notice for Children
4. Contacting Us

 **Our Information Practices**

**1. Personal Information We Collect**

Ex. D

41

We may collect information that describes or relates to you and is classified as Personal Information or Personal Data under applicable state laws (collectively, "**Personal Information**"). Personal Information does <u>not</u> include:

- Publicly available information as defined under applicable state laws.
- Deidentified or aggregated information as defined under applicable state laws.
- Other information excluded from the applicable state laws, including but not limited to Personal Information governed by HIPAA or the Gramm Leach Bliley Act.

In the past 12 months, we may have collected the following categories of Personal Information:

- **Identifiers** such as name, contact information, online identifiers, and government-issued ID numbers;
- **Characteristics of Protected Classifications** under state or federal law such as age and medical conditions;
- **Commercial Information** such as transaction information and purchase history;
- **Internet or Network Activity Information** such as browsing history, interactions with our Services, Internet Protocol (IP) address, Media Access Control (MAC) address; operating system and version; Internet browser type and version (for more information, see the Cookies and Other Tracking Technologies section, below);
- **Geolocation Data** such as device location;
- **Audio, Electronic, Visual and Similar Information** such as call and video recordings; and
- **Professional or Employment-Related Information** such as place of employment and job title.

We may collect this Personal Information directly from you and automatically when you use our Services. We also may collect this Personal Information from our affiliates, vendors, joint marketing partners, and social media platforms.

**2. How We Use Personal Information**

To the extent we collect your Personal Information as described above, we may use your Personal Information for the following purposes:

- **Services and Support.** To provide and operate our Services, communicate with you about your use of the Services, provide you with information about our Services, including information about health care, health related services, resources and benefits that will help you manage your health; sending administrative information to you, such as changes to our terms, conditions, and policies; provide troubleshooting and technical support, respond to your inquiries, fulfill your orders and requests,

Ex. D
42

process your payments and claims, communicate with you about the Services, complete transactions, and provide quotes;

- **Customization and Personalization.** To tailor content we may send or display on the Services, including to offer location customization and personalized help and instructions, and to otherwise personalize your experiences;
- **Marketing and Advertising.** For marketing and advertising purposes. For example, to send you information about our Services, such as offers, promotions, newsletters and other marketing content, as well as any other information that you sign up to receive. We also may use certain information we collect to manage and improve our advertising campaigns so that we can better reach people with relevant content;
- **Analytics and Improvement.** To better understand how users access and use the Services, and our other products and offerings, and for other research and analytical purposes, such as to evaluate and improve our Services and business operations, to develop services and features, and for internal quality control and training purposes;
- **Research and Surveys.** To administer surveys and questionnaires, such as for market research or member satisfaction purposes;
- **Infrastructure.** To maintain our facilities and infrastructure and undertake quality and safety assurance measures;
- **Authentication.** To authenticate or confirm your identity;
- **Security and Protection of Rights.** To protect the Services and our business operations; to protect our rights or those of our stakeholders; to prevent and detect fraud, unauthorized activities and access, and other misuse; conduct risk and security control and monitoring; where we believe necessary, to investigate, prevent or take action regarding illegal activities, suspected fraud, situations involving potential threats to the safety or legal rights of any person or third party, or violations of our Terms of Use as well as any supplemental terms that may apply;
- **Compliance and Legal Process.** To comply with the law and our legal obligations, to respond to legal process and related to legal proceedings;
- **General Business and Operational Support.** To consider and implement mergers, acquisitions, reorganizations, bankruptcies, and other business transactions such as financings, and related to the administration of our general business, accounting, auditing, compliance, recordkeeping, and legal functions; and
- **Business Transfers.** To consider and implement mergers, acquisitions, reorganizations, and other business transactions, and where necessary to the administration of our general business, accounting, recordkeeping, and legal functions.
- **Deidentification.** We may also aggregate or de-identify data by removing identifying details so it no longer identifies an individual.

We retain the Personal Information we collect as long as reasonably necessary for the purposes described above or otherwise disclosed to you at the time of collection. For

Ex. D

43

example, we will retain your account data for as long as you have an active account with us, as well as an additional period of time as necessary to protect, defend or establish our rights, defend against potential claims, or comply with our legal obligations.

### 3. How We Disclose Personal Information

To the extent we collect your Personal Information as described above, we may disclose Personal Information for the following purposes:

- **Operating the Services and Providing Related Support.** To provide and operate our Services, communicate with you about your use of the Services, provide troubleshooting and technical support, respond to your inquiries, fulfill your orders and requests, and for similar service and support purposes.
- **Business Transfers.** If we or our affiliates are or may be acquired by, merged with, or invested in by another company, or if any of our assets are or may be transferred to another company, whether as part of a bankruptcy or insolvency proceeding or otherwise, we may transfer the information we have collected from you to the other company. As part of the business transfer process, we may share certain of your Personal Information with lenders, auditors, and third-party advisors, including attorneys and consultants.
- **In Response to Legal Process.** We may disclose your Personal Information to comply with the law, a judicial proceeding, court order, or other legal process, such as in response to a court order or a subpoena.
- **To Protect You, Ourselves, and Others.** We disclose your Personal Information when we believe it is appropriate to do so to investigate, prevent, or take action regarding illegal activities, suspected fraud, situations involving potential threats to the safety of any person, violations of our Terms of Use or this Notice, or as evidence in litigation in which we are involved.

We may disclose the Personal Information that we collect for the purposes described above with the following parties:

- **Vendors.** We may disclose Personal Information we collect to our service providers or agents who perform functions on our behalf. These may include, for example, IT service providers, help desk, payment processors, analytics providers, consultants, auditors, and legal counsel.
- **Our Affiliates.** We may disclose Personal Information we collect to our affiliates or subsidiaries.
- **Our Business Customers**. Any Personal Information that we collect and process on behalf of a business client will be disclosed as directed by that business customer.
- **Third-Party Ad Networks and Providers**. We may disclose Personal Information to third-party ad network providers, sponsors and/or traffic measurement services.

Ex. D

44

These third parties may use cookies, JavaScript, web beacons (including clear GIFs), and other tracking technologies to measure the effectiveness of their ads and to personalize advertising content to you. These third-party cookies and other technologies are governed by each third party's specific Privacy Notice, not this one. To exercise your choices about receiving third-party ads, see the "Tracking and Advertising Choices" section below.

- **Government or Public Authorities**. We may disclose Personal Information to a third party if (a) we believe that disclosure is reasonably necessary to comply with any applicable law, regulation, legal process, or governmental request, (b) to enforce our agreements, policies, and terms of service, (c) to protect the security or integrity of our Services, (d) to protect the property, rights, and safety of us, our users, or the public from harm or illegal activities, (e) to respond to an emergency which we believe in the good faith requires us to disclose information to assist in preventing the death or serious bodily injury of any person, or (f) to investigate and defend ourselves against any third-party claims or allegations.



## Cookies and Other Tracking Technologies

We may use cookies, tags, and other tracking mechanisms to track information about your use of our Services, and to provide, customize, evaluate, and improve our Services.

**1. Cookies and Other Technologies**

A cookie is a small alphanumeric identifier that is placed on your website browser when you use our Services. Cookies are transferred to your device's hard drive through your web browser for record-keeping purposes. Some cookies allow us to make it easier for you to navigate our Services, while others are used to allow us to track your activities at our Services. Below are descriptions of the cookies and other technologies we use on our Site.

- **Session Cookies**. Session cookies exist only during an online session. They disappear from your device when you close your browser or turn off your device. We use session cookies to allow our systems to uniquely identify you during a session while accessing our Services. This allows us to display content and provide our Services to you while navigating our Site.
- **Persistent Cookies**. Persistent cookies remain on your device after you have closed your browser or turned off your device. We use persistent cookies to track statistical information about user activity.
- **Clear GIFs, Pixel Tags and Other Technologies**. Clear GIFs are tiny graphics with a unique identifier, similar in function to cookies. In contrast to cookies, which are stored

Ex. D

45

on your computer's hard drive, clear GIFs are embedded invisibly on web pages. We may use clear GIFs (a.k.a. web beacons, web bugs or pixel tags), in connection with our Services to, among other things, track activities of Site visitors, and to help us manage content on our Services.

- **Third-Party Analytics**. We use third-party tools, such as Google Analytics and related technologies, which are operated by third-party companies, to evaluate usage of our Services. These third-party analytics companies use cookies, pixels, and other tracking technologies to collect usage data about our Services to provide us with reports and metrics that help us evaluate usage of our Services, improve our Services, and enhance performance and user experiences. To learn more about Google's privacy practices, please review the Google Privacy Notice at https://www.google.com/policies/privacy/partners/. You can also download the Google Analytics Opt-out Browser Add-on to prevent your data from being used by Google Analytics at https://tools.google.com/dlpage/gaoptout.

- **Third-Party Advertising**. We work with third-party ad networks, analytics, marketing partners, and others ("**third-party ad companies**") to personalize content and display advertising within our Services, as well as to manage our advertising on third-party Websites. We and these third-party ad companies may use cookies, pixels tags, and other tools to collect browsing and activity information within our Services (as well as on third-party websites and services), as well as IP address, unique ID, cookie and advertising IDs, and other online identifiers. We and these third-party ad companies use this information to provide you more relevant ads and content within our Services and on third-party websites, and to evaluate the success of such ads and content.

- **Session Replay**. We use session replay technologies so we can diagnose problems with our Services and identify areas for improvement. The data collected by this technology is not accessible by or shared with third parties or service providers.

### 2. Tracking and Advertising Choices

If you wish to prevent cookies from tracking your activity on our Services or visits across multiple websites, there are tools you can use to disable cookies and opt out of interest-based advertising.

- **Browser Solutions for Disabling Cookies**. If you wish to prevent cookies from tracking your activity on our Services or visits across multiple websites, you can set your browser to block certain cookies or notify you when a cookie is set. The Help portion of the toolbar on most browsers will tell you how to prevent your device from accepting new cookies, how to have the browser notify you when you receive a new cookie, or how to disable cookies altogether. Visitors to our Services who disable cookies will be able to browse the Services, but some features may not function.

Ex. D

46

- **Industry Solutions for Opting Out of Interest-Based Advertising**. Notwithstanding the above, you may follow the steps provided by initiatives that educate users on how to set tracking preferences for most online advertising tools. These resources include the Network Advertising Initiative (https://thenai.org/about-online-advertising/) and the Digital Advertising Alliance (https://digitaladvertisingalliance.org/).

Note, your opt out may not be effective if your browser is configured to reject cookies. Opting out of participating third party ad networks does not opt you out of being served advertising. You may continue to receive generic or "contextual" ads on our Services. You may also continue to receive targeted ads on other websites, from companies that do not participate in the above programs.

We are not responsible for the completeness, effectiveness, or accuracy of any third-party opt-out options or programs.



## Communication Functionality and Preferences

We constantly seek to improve our ability to communicate with you. And while we generally communicate with you in accordance with any preferences you have set, we may sometimes use other channels and formats to best provide you with available Services. Not all types of information and communication channels, formats, and choices may be available to you or honored at a particular time.

By registering for an account, we will preselect initial communication preferences. These initial preferences include various communication categories for communicating with you through e-mail or other electronic means. These preferences will provide you with certain communications electronically that were previously provided by automated outbound telephone calls or mail, and some additional communications that you would not have otherwise received. If you have previously expressed preferences to receive communications through a different communication channel, your preferences will be retained. You may modify your communication preferences on the communication preferences page of the website or mobile application. We may modify the communication categories associated with your initial communication preferences to better service you.



## State-Specific Disclosures

Residents of certain jurisdictions have additional rights under applicable privacy laws. The first subsection below describes the rights created by the state privacy laws that are

Ex. D

47

currently effective or will take effect in 2025. If you are a resident of California, please refer to the "California Privacy Rights" subsections below.

**1. Rights for Residents of Colorado, Connecticut, Delaware, Iowa, Maryland, Minnesota, Montana, Nebraska, New Hampshire, New Jersey, Oregon, Texas, Tennessee, Utah, and Virginia**

The list below describes the rights available under the Colorado Privacy Act; Connecticut Data Protection Act; Delaware Personal Data Privacy Act; Iowa Consumer Data Protection Act; Maryland Online Data Privacy Act (effective October 2025); Minnesota Consumer Data Privacy Act (effective July 2025); Montana Consumer Data Privacy Act; Nebraska Data Privacy Act; New Hampshire Privacy Act; New Jersey Data Protection Act; Oregon Consumer Privacy Act; Texas Data Privacy and Security Act; Tennessee Information Privacy Act (effective July 2025); the Utah Consumer Privacy Act; and the Virginia Consumer Data Protection Act.

- **Right to Access:** You have the right to confirm whether or not we are processing your Personal Information and to access such Personal Information.
- **Right to Correction:** You have the right to correct inaccuracies in your Personal Information, taking into account the nature of the Personal Information and the purposes of the processing of your Personal Information.
- **Right to Deletion:** You have the right to delete the Personal Information provided to us by you.
- **Right to Data Portability:** You have the right to obtain a copy of the Personal Information that you previously provided to us in a portable and, to the extent technically feasible, readily usable format that allows you to transmit your Personal Information to another controller without hindrance, where the processing is carried out by automated means.
- **Right to Opt-Out of Sales, Targeted Advertising, and Profiling:** For purposes of the applicable state laws, a "sale" includes disclosing Personal Information to a third party in exchange for monetary compensation or other valuable consideration. We do not "sell" Personal Information under this definition. Some states provide a right to opt out of the automated processing of your Personal Information by us for decisions that produce legal or similarly significant effects concerning you, but we do not process Personal Information for such profiling. To opt out of targeted advertising, please click on the Opt-Out Link on the bottom of the website homepage.
- **Right to Appeal:** If we decline to take action regarding your request, you have the right to appeal. We will notify you providing our reasons and instructions for how you can appeal the decision. Note that Utah law does not provide a right to appeal.

Ex. D

48

If any of the rights described above apply to you, you may make a request by filling out our form at **Privacy Web Form** (onetrust.com) or mail us at: P.O. Box 188014, Chattanooga, TN 37422 ATTN: Privacy Office. Please indicate that you are making a request pursuant to your "[ State ] Privacy Rights" and provide us with the following information: (1) first and last name; (2) email address; (3) physical address; and (4) date of birth. We will take steps to verify your request by matching the information provided by you with the information we have in our records.

## 2. California Privacy Rights

Under the CCPA, California residents have the right to receive certain disclosures regarding our information practices related to "Personal Information", as defined under the CCPA. To the extent you are a resident of California, and we collect Personal Information subject to CCPA, the following applies.

### Disclosures to Third Parties

This section relates to our third-party disclosures. We may disclose Personal Information to service providers, as described above in this Notice. We also may disclose the Personal Information we collect (as described above) to the following categories of third parties.

- Third party analytics providers
- Regulators, government entities, and law enforcement
- Affiliates and subsidiaries

Additionally, CCPA defines a "sale" as disclosing or making available to a third-party Personal Information in exchange for monetary or other valuable consideration, and "sharing" broadly includes disclosing or making available Personal Information to a third party for purposes of cross-context behavioral advertising. While we do not disclose Personal Information to third parties in exchange for monetary compensation, we may "sell" or "share" (as defined by the CCPA) identifiers and internet and electronic network activity information to third parties. We do so in order to improve and evaluate our advertising campaigns and better reach customers and prospective customers with more relevant ads and content. As described in the Cookies and Other Technologies section above, although we may also use session replay technologies to record users' interactions with the Services, this data is not accessible by or shared with third parties or service providers.

We do not sell or share any Personal Information about individuals who we know are under sixteen (16) years old.

### Your CCPA Rights

Ex. D

49

To the extent you are a resident of California, you may have the following rights to your Personal Information:

- **Right to Access**: With respect to the Personal Information we have collected about you in the prior 12 months, you have the right to request from us (up to twice per year and subject to certain exemptions): (i) categories of Personal Information about you we have collected; (ii) the sources from which we have collected that Personal Information; (iii) our business or commercial purposes for collecting, selling, or disclosing that Personal Information; (iv) the categories of third parties to whom we have disclosed that Personal Information; and (v) a copy of the specific pieces of your Personal Information we have collected.
- **Right to Correct**: You have the right to request that we correct inaccuracies in your Personal Information.
- **Right to Delete**: Subject to certain conditions and exceptions, you may have the right to request deletion of Personal Information that we have collected about you.
- **Right to Opt-Out of Sale/Sharing**: You may have the right to opt-out of the "sale" or "sharing" of your Personal Information.
- **Right to Non-Discrimination**: We will not discriminate against you for exercising any of the rights described in this section.
- **Authorized Agent**: You may designate someone as an authorized agent to submit requests and act on your behalf. To do so, you must provide us with written permission to allow the authorized agent to act on your behalf.

In order to opt out of sharing information for targeted marketing, if applicable, please click on the **Opt-Out Link** titled "**Do Not Sell or Share My Personal Information**" on the bottom of the website homepage. To make a request for the other rights described above, please fill out our form at Privacy Web Form (onetrust.com) or write to us at: P.O. Box 188014, Chattanooga, TN 37422 ATTN: Privacy Office, or contact us toll free at the number on the back of your member ID card or by calling customer service at 877-279-6391.

Please indicate you are making a request pursuant to your "California Privacy Rights". You must provide us with the following information: (1) first and last name; (2) email address; (3) physical address; and (4) date of birth. We will take steps to verify your request by matching the information provided by you with the information we have in our records. In some cases, we may request additional information in order to verify your request or, where necessary, to process your request. If we are unable to adequately verify a request, we will notify the requestor. If we are unable to adequately verify a request, we will notify the requestor.



**Additional Information**

Ex. D

50

## 1. Changes to this Privacy Notice

The Notice was updated on the date set forth above and will be effective on the date it is posted. We may change, update, or modify this Notice from time to time, so please be sure to check back periodically. We will post any updates to this Notice here. A different version number and/or updated date indicates that a change has been made. If we make any changes to this Notice that materially affect our practices regarding our use of the personal information we previously collected, we will endeavor to provide you with notice, such as by posting prominent notice on our website.

## 2. Links to Other Websites

Our Services may contain links to unaffiliated websites. Any access to and use of such linked websites is not governed by this Privacy Notice, but instead is governed by the privacy policies of those websites. We are not responsible for the information practices of such websites, including their collection of your personal information. You should review the privacy policies and terms for any third parties before proceeding to those websites or using those features.

## 3. Our Online Privacy Notice for Children

Our Services are designed for a general audience and are not directed to children under the age of 13. We do not knowingly collect personal information online from any person we know to be under the age of 13. If we discover that a child under 13 has provided us with information, we will delete such information from our systems. If you believe we have impermissibly collected personal information from someone under the age of 13, please contact us using the information below.

## 4. Contacting Us

If you have any questions about this Privacy Notice, please contact us by mail at: P.O. Box 188014, Chattanooga, TN 37422 ATTN: Privacy Office or call us toll-free at 1-800-711-5672.

Ex. D

51